UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

UNITED STATES OF AMERICA,

     Plaintiff,

v.

CASE NO. 3:19-cv-1480-J-32JBT

REAL PROPERTY, INCLUDING ALL
IMPROVEMENTS THEREON AND
APPURTENANCES THERETO,
LOCATED AT 22020 FRONT BEACH
ROAD, UNIT 2, PANAMA CITY
BEACH, FLORIDA;

and

3232 MAGNOLIA ISLANDS BOULEVARD,
PANAMA CITY BEACH, FLORIDA,

     Defendants.

### VERIFIED COMPLAINT FOR FORFEITURE *IN REM*

In accordance with Rule G(2) of the Supplemental Rules for Admiralty

or Maritime Claims and Asset Forfeiture Actions, Plaintiff United States of

America brings this complaint and alleges upon information and belief as

follows:

### NATURE OF THE ACTION

1.     This is a civil action *in rem* to forfeit to the United States two

pieces of real property (Defendant Properties). This action is brought pursuant

to 18 U.S.C. § 981(a)(1)(C) because the Defendant Properties were purchased

with proceeds of health care fraud, mail fraud and wire fraud, in violation of 18

U.S.C. § 1347, 18 U.S.C. § 1341 and 18 U.S.C. § 1343.  In addition, this action

is brought pursuant to 18 U.S.C. § 981(a)(1)(A) because the Defendant

Properties were involved in monetary transactions in violation of 18 U.S.C. §

1957, consisting of wire fraud proceeds or property traceable to such proceeds,

and were involved in monetary transactions of a value greater than $10,000.00.

## JURISDICTION AND VENUE

2.   The Court has subject matter jurisdiction over this action pursuant to

28 U.S.C. § 1345, which provides the Court with jurisdiction over all civil actions

commenced by the United States, and pursuant to 28 U.S.C. § 1355, which provides

the Court with jurisdiction over actions to recover or enforce forfeitures.

3.   This Court has *in rem* jurisdiction over the Defendant Properties

because pertinent acts giving rise to the forfeiture occurred in the Middle District of

Florida. 28 U.S.C. § 1355(b)(1)(A).

4.   Pursuant to Rule G(3)(a) of the Supplemental Rules for Admiralty or

Maritime Claims and Asset Forfeiture Actions, and 18 U.S.C. § 985(c)(2), a notice

of this forfeiture, as well as a copy of the complaint, shall be posted on each of the

properties listed above and served on the owners of the Defendant Properties.

Thereafter, neither the issuance of a warrant *in rem* nor any other action will be

necessary for the Court to establish *in rem* jurisdiction over the properties. 18

U.S.C. § 985(c)(3).

     5.    Venue properly lies in the Middle District of Florida pursuant to 28

U.S.C. § 1395(a) because the action accrued within the district.

## THE DEFENDANTS *IN REM*

     6.    The Defendant Properties, located in Panama City Beach,

Florida, are described as:

     a.    22020 Front Beach Road, Unit 2, Panama City Beach,
Bay County, Florida 32413, including all improvements
thereon and appurtenances thereto, more particularly
described as:

     UNIT 2:

     COMMENCE at the Northeast corner of Lot 10, Block 5,
Kiska Beach Subdivision, according to the Plat thereof, as
recorded in Plat Book 3, Page 24, of the Public Records of
Bay County, Florida; thence S23°22'32"W, along the East
line of said lot, a distance of 125.15 feet to the Southeast
corner of said lot; thence N66°28'49"W, along the South
line of said lot, a distance of 50.14 feet to the Northeast
corner of Lot 16, of said Block 5; thence S23°20'24"W,
along the East Line of said Lot 16, a distance of 16.47 feet;
thence leaving said East line, N66°39'36"W, a distance of
9.35 feet; thence N66°48'00"W, a distance of 22.25 feet;
thence S23°46'36"W, a distance of 8.04 feet; thence
N66°43'50"W, a distance of 18.78 feet to the POINT OF
BEGINNING; thence continue N66°43'50"W, a distance
of 18.62 feet; thence N23°18'04"E, a distance of 7.99 feet;
thence N66°37'29"W, a distance of 1.00 feet; thence
S23°45'08"W, a distance of 76.03 feet; thence S66°44'11"E,

a distance of 20.25 feet; thence N23°15'49"E, a distance of 68.04 feet to the POINT OF BEGINNING. Said parcel is part of Lot 17, Block 5, of said Kiska Beach Subdivision.

Parcel Identification No. 36015-000-015

(Front Beach Road Property); and

b.   3232 Magnolia Islands Boulevard, Panama City Beach, Bay County, Florida 32408, including all improvements thereon and appurtenances thereto, more particularly described as:

Lot 181 and 182, The Preserve on the Bay Phase IV-A, according to the map or plat thereof, as recorded in Plat Book 19, Page 6 of the Public Records of Bay County, Florida.

Parcel Identification No. 31365-860-000

(Magnolia Islands Boulevard Property).

## FORFEITURE AUTHORITY

7.   Because the Defendant Properties were purchased with proceeds of health care fraud, mail fraud and wire fraud, they are subject to civil forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(C), which states the United States may civilly forfeit property, real or personal, which constitutes, or is derived from proceeds of "specified unlawful activity," as defined in 18 U.S.C. § 1956(c)(7). Section 1956(c)(7) includes activity constituting a Federal health care offense as that term is defined in 18 U.S.C. § 24 and also defines "specified unlawful activity" to include activities described in section 1961(1), such as violations of 18 U.S.C. § 1341 (mail fraud) and 18 U.S.C. § 1343 (wire fraud).

4

8.     Because monetary transactions were knowingly conducted with more than $10,000.00 in funds from specified unlawful activity, in violation of 18 U.S.C. § 1957, the Defendant Properties are also subject to civil forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(A), which states the United States may forfeit any property, real or personal, involved in a transaction or attempted transaction, in violation of 18 U.S.C. § 1957, or any property traceable to such property.

9.     Specific details of the facts supporting the forfeiture of the Defendant Properties have been provided by Federal Bureau of Investigation (FBI) Special Agent Eric Petersen (SA Petersen), who obtained the information through investigation, reviewing documents, and communicating with witnesses and other law enforcement officers.

10.     The facts set forth below are not all the facts gathered by law enforcement during the investigation. Rather, as required by Rule G(2)(f), the facts set forth herein support a reasonable belief that the government will be able to meet its burden of proof at trial. Specifically, that the government will be able to show by a preponderance of the evidence that the Defendant Properties were purchases with the proceeds of health care fraud, wire fraud, and mail fraud, in violation of 18 U.S.C. §§ 1347, 1343, and 1341 and were involved in transactions in violation of section 1957.

## FACTS

11.     At all relevant times, SA Petersen has been a Special Agent with the

FBI, Jacksonville Division.   He has been employed in this capacity for approximately

nine years.   He is presently assigned to the white collar crime squad where he

investigates a wide variety of health care fraud matters, including schemes to defraud

Medicare and Medicaid.   In this capacity, he is authorized to conduct investigations

into criminal violations committed against the United States, including, but not limited

to:   health care fraud, payment and receipt of illegal health care kickbacks, false

statements made in connection with a health care benefit program, and related

conspiracies.   He has extensive experience investigating fraud related to complex

financial crimes, including fraud against the United States health care system.

## I.     THE HEALTH CARE FRAUD

12.     This investigation concerns fraudulent claims submitted to

Medicare for Part B[1] laboratory services, namely, genetic testing for

Hereditary Cancer Screening (CGX) and Pharmacogenomics (PGX).

Medicare reimburses for these tests at rates varying from approximately a few

hundred dollars to over $6,000 for a panel of tests.

---

[1] Individuals who receive benefits under Medicare are referred to as "beneficiaries."
Beneficiaries are eligible to receive a variety of services, including hospital services ("Part
A"), physician services ("Part B"), and prescription drug coverage ("Part D").  Part B covers
outpatient physician services, such as office visits, minor surgical procedures, and laboratory
services, such as drug testing and genetic testing, when certain criteria are met.

13.     Federal laws prohibit Medicare payments for services that are not reasonable and necessary for the diagnosis or treatment of an illness, and require that a physician or other Medicare provider certify that services performed are medically necessary. *See* 41 U.S.C. § 1395(a)(1)(A); 42 C.F.R. § 410.32(a). Stated differently, Medicare does not pay for cancer genetic testing unless (i) a beneficiary has a personal history of cancer or signs or symptoms of cancer, (ii) the test is ordered by a physician who is treating the beneficiary, and (iii) the test results are used by the physician in the management of the beneficiary's specific medical problem. Medicare does not pay for screening tests for beneficiaries who exhibit no symptoms of cancer.

14.     Helix Management Solutions, LLC (Helix) is a genetic testing marketing company in Panama City, Florida that, according to witnesses, used telemarketing call centers and health fairs to market medically unnecessary CGX and PGX tests to Medicare beneficiaries in exchange for kickbacks from laboratories. SA Peterson learned through his investigation that Edward Christopher White, Jr. is the founder and owner of Helix.

15.     White also founded and owns the following companies underneath the Helix umbrella: D.A.R.C., LLC; D.A.R.C. Enterprises, LLC; Mediverse, LLC; White Medical, LLC; Whitewater Consulting, LLC; White Molecular Genetics, LLC; MWM Enterprises, LLC; and Invictus Medical

Group, LLC. These entities, along with Helix, were used to solicit Medicare beneficiaries to take the medically unnecessary genetic tests in exchange for kickbacks during the period of approximately May 2017 through approximately August 2019.

16.    In June 2019, in an effort to hide White's involvement in this scheme, the Florida Annual Reports for Helix, Mediverse, White Molecular Genetics, and Whitewater Consulting were amended. The amended reports that had listed White as the Registered Agent and Manager of these entities, now showed John W. Roberts, White's friend and corporate attorney, as the Registered Agent and Helix's Chief Financial Officer, and White's business partner, Brian Moore, as Manager. Despite these amended reports, White remained the owner and organizer of Helix and all of its umbrella companies.

17.    The laboratories with which White, through Helix and its subsidiaries, conspired included: LabSolutions, CQuentia, Med Health Management Services, Personalized Genetics, Trinity, Acadian, PerkinElmer, and Total Diagnostix II dba CQuentia. White used his own call center as well as sub-marketers to solicit Medicare beneficiaries to receive and submit medically unnecessary genetic tests to White. White then mailed the genetic test kits to the various laboratories for processing. Thereafter, the laboratories

billed Medicare for processing these genetic tests and paid White illegal kickbacks of fifty percent of the net proceeds received from Medicare for each billed test. During the period of the scheme, these laboratories paid White approximately $49,480,836.78 in illegal kickbacks, which were deposited into bank accounts for D.A.R.C. Enterprises LLC, Mediverse LLC, White Medical LLC, Whitewater Consulting LLC, White Molecular Genetics LLC, and Helix.

### A.   Cooperating Witnesses and Corroborating Information

18.   Cooperating Witness (CW1) informed SA Peterson that she/he was recruited by White in approximately 2017 to open and operate a telemarketing call center for the genetic tests. CW1 formed Company 1, and White paid CW 1 a kickback of $50 to $100 per completed test kit.

19.   The telemarketers at Company 1 worked off of leads that White and his companies sent to CW 1. The leads contained Medicare beneficiaries' personal and medical information, and were uploaded into a virtual call center, "Five9," which auto-dialed the beneficiaries for the telemarketers.

20.   According to CW 1, when a Company 1 telemarketer convinced a beneficiary to submit to a genetic test, the telemarketer filled out a "Patient Profile" sheet which was then submitted to Helix through a Google Drive account. Thereafter, Helix employees mailed the beneficiary an envelope

containing genetic testing swab kits via the United States Postal Service. Beneficiaries then mailed completed test kits back to Helix, which were then forwarded to various laboratories for testing. White kept track of the number of completed test kits generated by Company 1's telemarketing efforts, and paid CW 1 through D.A.R.C., one of White's companies.

21.    Between February 2018 and August 2019, White paid Company 1 almost $1.6 million dollars through four of White's business accounts:  in February 2018, White paid CW 1 $10,000 from Mediverse LLC's Wells Fargo account number 1276801659 (WF 01659);  between March 2018 and September 2018, White paid CW 1 approximately $842,172 from Helix Management Solutions LLC Wells Fargo account number 3569308335 (WF 08335).  Between March 2018 and July 2019, White paid CW 1 approximately $592,745 from White Medical LLC's Wells Fargo account number 6027704045 (WF 04045).  Between April 2019 and August 2019, White paid CW 1 $153,000 from D.A.R.C. Enterprises LLC's Wells Fargo account number 8611529838 (WF 29838).   Funds from two of these accounts – WF 04045, WF 29838 funded the purchase of the Defendant Properties, which is discussed further below.

22.    CW 1 advised that CQuentia was one of the laboratories to which White sent completed test kits. SA Peterson's review of bank records revealed that between December 2017 and February 2019, Total Diagnostix II LLC dba CQuentia paid approximately $4,366,257 in kickbacks to White's Company, Helix Management Solutions LLC., which was deposited into WF 08335.

23.    Cooperating witness 2 (CW 2) is one of two managers/members of Company 2. CW 2, a resident of Palm Beach County, is not a medical professional and does not have any formal medical training.

24.    In interviews with law enforcement agents, CW 2 acknowledged that s/he had, since at least January 2017, accepted illegal kickbacks from LabSolutions in exchange for referring beneficiaries and doctor's orders (D.O.s) to LabSolutions. CW 2 further explained that s/he also recruited other "sales representatives" who were paid illegal kickbacks by LabSolutions to refer beneficiaries and D.O.s.

25.    According to CW 2, White was one of the largest sales representatives that sold beneficiaries and D.O.s to LabSolutions. According to CW 2, White stated that LabSolutions and CQuentia paid him fifty percent of their adjudicated reimbursement amount from Medicare. Other

cooperating witnesses have confirmed to agents that White sold Medicare beneficiaries and D.O.s to LabSolutions, among other labs.

26.   A review of bank records revealed that between August 2017 and August 2019, LabSolutions paid kickback proceeds of approximately $15.9 million net to White through two of his companies.  Specifically relevant to this complaint, as discussed below, is LabSolutions' payments of approximately $13.6 million to White Medical LLC between March and August, 2019.

27.   Company 3 and Company 4 are laboratories owned by CW 3. Company 3 and Company 4 paid kickbacks to White in exchange for completed genetic test kits received from Medicare beneficiaries.

28.   In an interview with law enforcement agents, CW 3 advised they split Medicare reimbursements 50/50 with White for genetic testing samples White sent to Company 4.

29.   Kickback payments to White from Company 3 flowed through Company 5, which was an entity jointly owned by Individual 1.  Company 3 paid Company 5 then Company 5 paid White kickback proceeds of approximately $15.4M.  Relevant to this Complaint, between February 2019 and May 2019, White's Wells Fargo Bank account number 9314267148 styled White Molecular Genetics LLC received approximately $5,517,390 from

Company 5.  Also, a review of bank records revealed that between February 2019 and August 2019, Company 4 paid kickback proceeds of approximately $13,751,039 to White's WF 29838 styled D.A.R.C. Enterprises LLC.

**B.     Beneficiary Interviews**

30.     On January 29, 2019, SA Petersen interviewed a Medicare Beneficiary (Beneficiary 1), who advised s/he attended the Senior Expo at the Prime Osborne Convention Center in Jacksonville, Florida in May 2018. While at the expo, Beneficiary 1 submitted saliva samples for genetic testing at the Senior Screenings booth.  Beneficiary 1 submitted the samples because the Senior Screening employee told him/her that the testing would be free because Beneficiary 1 had Medicare coverage.  Beneficiary 1 advised me that there were no medical professionals present at the Senior Screenings booth.

31.     In approximately August 2018, Beneficiary 1 received a CGX laboratory report from LabSolutions and a PGX report from CQuentia; both reports were accompanied by a cover letter from Lotus Health and Wellness, White's telemedicine provider.  The laboratory reports listed White's company "MEDIVERSE" as the "Client" and Tarik Farrag as the "Physician."  Beneficiary 1 has never heard of or spoken with Doctor Farrag. Furthermore, Beneficiary 1 advised that s/he never shared the laboratory reports with his/her primary care physician because the laboratory reports

were so uninformative. Medicare was billed approximately $30,027.26 for Beneficiary 1's CGX and PGX tests, and subsequently paid $6,869.95 to the processing laboratories.

32.     On January 29, 2019, SA Petersen interviewed a Medicare Beneficiary (Beneficiary 2), who advised that sometime in 2018, s/he received a phone call regarding genetic testing. Thereafter, Beneficiary 2 received a USPS package containing a genetic testing kit postmarked April 27, 2018, from White's company, "MEDIVERSE, 8340 Front Beach Road, Panama City, Florida." The package included a swab kit, which Beneficiary 2 completed and mailed back in the enclosed return envelope. Beneficiary 2 provided the package and its remaining contents to me, including a "CQuentia Patient Instructions" form. As of the date of the interview, Beneficiary 2 had not received any test results. Additionally, Beneficiary 2 has never heard of or spoken with Doctor Tarik Farrag. Medicare was billed approximately $22,907.06 for Beneficiary 2's genetic testing, and subsequently paid $3,895.36 to the processing laboratory.

33.     An analysis of White's bank records revealed that between March 2018 and November 2018, White paid his telemedicine provider, Lotus Health and Wellness (Lotus), which is owned by Richard Garipoli, approximately $2.5M from bank accounts of three White owned entities.

14

Specifically, White paid Lotus approximately $835,000 from WF 08335

entitled Helix Management Solutions LLC, approximately $378,100 from WF

01659 entitled Mediverse LLC, approximately $1,254,400 from WF 91524

and approximately $37,500 from Centennial 82348 both entitled Whitewater

Consulting LLC.

### C.    Receipt of Medicare Proceeds and Laundering of Funds

34.    Throughout the duration of the scheme, White's companies were

solely funded by the receipt of the illegal kickbacks of the healthcare fraud

proceeds.  A portion of these illegal proceeds were then transferred to White's

personal Wells Fargo account, WF 66859, to purchase the Defendant real

properties.  During the period of the fraud, White did not have income from

any source other than the illegal proceeds or from the unrelated companies he

invested into with the fraud proceeds.  During the period of June 1, 2017

through August 16, 2019, a total of $18,317,593.25 in deposits and other

credits posted to WF 66859.  This amount consisted primarily of fraud

proceeds traceable to the genetic fraud scheme described herein.  Less than four

percent of the deposits ($646,083.90) were from sources other than White's

marketing firms engaged in the fraudulent genetic testing scheme.

35.    The laboratories deposited the illegal kickbacks into various

Wells Fargo bank accounts owned by White and styled for his companies.

The following paragraphs (a through c) detail the breakdown of kickbacks

received into the accounts and laundering of these funds into White's personal

bank account[2]:

a.    D.A.R.C. received approximately $13,751,038 from
Personalized Genomics Laboratory and Trinity
Laboratory after it passed through Company 4, these were
deposited in D.A.R.C.'s WF 29838,   D.A.R.C. remitted
approximately $4,927,607 of the healthcare fraud proceeds
to White's personal Wells Fargo bank account
9303466859 (WF 66859).

b.    White Medical received approximately $13,690,526 from
LabSolutions which was deposited in its account - WF
04045. White Medical remitted approximately $3,332,643
of the healthcare fraud proceeds to White's personal WF
66859.

c.    White Molecular Genetics received approximately
$5,517,390 from various laboratories through pass through
a pass through entity, Company 5, which was deposited in
WF 67148. White Molecular Genetics remitted
approximately $4,216,000 of the healthcare fraud proceeds
to White's personal WF 66859.

---

[2] White's personal account, WF 66859, also received deposits of $648,814.45 of fraud
proceeds from another of his companies, Helix Management Solution, WF 08335.
Helix Management Solutions had received approximately $4.3 million in fraud
proceeds from Total Diagnostix/Cquentia.

36.     White's businesses were opened in an attempt to hide White's involvement in the aforementioned scheme or otherwise make the profit appear more legitimate.  On March 6, 2019, White wrote in an e-mail to a colleague that his companies were trying to "be more and more compliant every day."  Further, in a phone call on June 17, 2019, White told a CW that he was trying to "maintain" his genetic testing business while moving into more legitimate businesses.

37.     The purchase of, or satisfaction of mortgages on, the Defendant Properties were funded with illegal kickbacks derived from the fraudulent genetic testing scheme.  Forensic analysis of all relevant bank accounts was conducted by FBI Forensic Accountant Kimberly Henderson (Henderson) to trace the fraud proceeds to the purchase of and/or payoff of loans secured to finance, the Defendant Properties.

## II.     PURCHASE OF THE DEFENDANT PROPERTIES

### A.     The Front Beach Road Property

38.     On or about October 29, 2015, White purchased the Front Beach Road Property for $515,000.00.

39.     Later, on December 30, 2016, White obtained a $280,000.00 mortgage on this property from The W.C. Grimsley, Jr. Irrevocable Trust.

As demonstrated in the paragraph below, this mortgage was paid off entirely with fraud proceeds.

40.    From June 26, 2017 through August 7, 2019, White paid $345,422.93 to The W.C. Grimsley, Jr. Irrevocable Trust from his personal account, WF 66859.  Between June 2017 through May 2019, White routinely made $2,457.20 monthly mortgage payments.  From June 12, 2019 through July 30, 2019, White began making larger mortgage payments than usual until he entirely paid off the mortgage on or about August 7, 2019 with fraud proceeds.

41.    Analysis conducted on WF 29838, an account held in the name of D.A.R.C. Enterprises, LLC, identified the transfer of fraud proceeds into WF 66859.  All deposits made into D.A.R.C. Enterprises, LLC were fraud proceeds as discussed above, particularly in paragraph 35(a) above.  As background, on July 24, 2019, the beginning balance of WF 29838 was $1,786,035.02, and on July 25, 2019, an additional $500,000.00 in fraud proceeds from Med Health Service was deposited into WF 29838.  A few days later, on August 6, 2019, $150,000.00 was transferred from WF 29838 to WF 66859, White's personal account.  This is the day prior to the payoff of the mortgage.

42.     Next, analysis conducted on WF 04045, an account held in the name of White Medical, LLC, identified the transfer of fraud proceeds from WF 04045 into White's personal account, WF 66859.  As background, on August 1, 2019, the beginning balance of WF 04045 was $353,225.69, and on August 5, 2019, $450,000.00 in fraud proceeds from LabSolutions, LLC were deposited into WF 04045.  All of the funds deposited into WF 04045 were fraud proceeds as discussed above, particularly in paragraph 35(b) above.  On August 6, 2019, $150,000.00 was transferred from WF 04045 to WF 66859, White's personal account.  This was the day prior to the payoff of the mortgage.

43.     On August 7, 2019, a withdrawal of $190,785.73 was made from WF 66859 to purchase cashier's check number 6608701260, made payable to The W.C. Grimsley, Jr. Irrevocable Trust for the same amount.  The cashier's check was used to satisfy the mortgage on the Front Beach Road Property. The monthly mortgage payments made to The W.C. Grimsley, Jr. Irrevocable Trust from approximately May 2017 through the payoff date of August 7, 2019, were funded with fraud proceeds.

**B.     The Magnolia Islands Boulevard Property**

44.     On or about July 8, 2019, White purchased the Magnolia Islands Boulevard Property for $1,325,000.00.  The closing was conducted by SETCO

Services, LLC. The purchase of this property was funded with fraud proceeds of the genetic testing scheme.

45.     A review of bank records for WF 04045 (White Medical, LLC) identified the deposit of fraud proceeds originating from the genetic testing scheme, as described above in paragraph 35(b). As background, on May 30, 2019, the beginning balance of WF 04045 was $1,209,622.25, which consisted of fraudulent proceeds. Later, on May 31, 2019, a deposit of $450,000.00 in fraudulent proceeds from Lab Solutions was made to WF 04045.

46.     On June 13, 2019, an online transfer in the amount of $25,000.00 was made from WF 04045 to White's personal account, WF 66859. Also on June 13, 2019, Brian K. Moore, the manager of White's marketing firms, sent a wire transfer of $20,000.00 from WF 66859 to an account held by SETCO Services, LLC to fund the initial escrow for the Magnolia Islands Boulevard Property.

47.     A review of bank records for WF 67148, an account held in the name of White Molecular Genetics, LLC, identified the deposit of fraud proceeds originating from HSD Management, LLC (HSDM). See paragraph 35(c) above. HSDM is one of the laboratories that paid White's marketing firms kickbacks as part of the fraudulent genetic testing scheme. As background, on May 1, 2019, the beginning balance was $1,729,693.62, which consisted of fraud proceeds. On May 9, 15, 30, and 31, 2019,

deposits in the form of HSDM wire transfers in the amounts of $542,964.06,

$482,061.55, $416,164.04 and $241,635.26, all consisting of fraudulent proceeds, were

made to WF 67148.

48.     On July 8, 2019, online transfers were made from WF 67148 in the

amounts of $1,000,000.00 and $325,000.00 to WF 66859 (White's personal account).

Also on July 8, 2019, White wired $1,301,958.21 from WF 66859 to an account held

by SETCO Services LLC to fund the balance owed on this property at closing.

49.     As previously discussed above, fraudulent funds totaling $1,321,958.21

were transferred via wire into an account held at SETCO Services, LLC for the

purchase of the Magnolia Islands Boulevard Property.

## CONCLUSION

WHEREFORE, pursuant to Supplemental Rule G, Plaintiff, United States of

America, requests that this Court initiate a process of forfeiture against the Defendant

Properties, and duly notice all interested parties to appear and show cause why the

forfeiture should not be decreed.

The United States further requests that the Court order the Defendant

Properties forfeited to the United States for disposition according to law, and that the

United States have such other relief as this case may require.

Dated: December 31, 2019                    Respectfully submitted,

                                            MARIA CHAPA LOPEZ
                                            United States Attorney

                                    By:     _Bonnie a. Glober_____

                                            BONNIE A. GLOBER
                                            Assistant United States Attorney
                                            Florida Bar No. 0748307
                                            300 N. Hogan Street, Suite 700
                                            Jacksonville, Florida 32202
                                            Telephone: (904) 301-6300
                                            Facsimile:   (904) 301-6310
                                            E-mail: bonnie.glober@usdoj.gov

<u>VERIFICATION</u>

Pursuant to 28 U.S.C. § 1746, I, Eric Petersen declare under the penalty of perjury, that

I am a Special Agent with United States Federal Bureau of Investigation.  I have read the foregoing Verified Complaint for Forfeiture in Rem and know the contents thereof, and that the matters contained in the Verified Complaint are true to my knowledge and belief.

I have acquired my knowledge in this matter through my personal experience, observation, and investigation, and through information conveyed to me by other law enforcement officers, as well as information contained in the official files and records of the United States.

Executed this 31st day of December 2019.

_____
ERIC PETERSEN
Special Agent
Federal Bureau of Investigation

JS 44 (Rev. 12/07)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

UNITED STATES OF AMERICA

**(b)** County of Residence of First Listed Plaintiff

(EXCEPT IN U.S. PLAINTIFF CASES)

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

AUSA Bonnie A. Glober, U.S. Attorney's Office, 300 N. Hogan Street, Suite 700, Jacksonville, FL 32202 (904) 301-6300

## DEFENDANTS

REAL PROPERTY - 22020 FRONT BEACH ROAD, UNIT 2, PANAMA CITY BEACH, FLORIDA; and 3232 MAGNOLIA ISLANDS BOULEVARD, PANAMA CITY BEACH, FLORIDA

County of Residence of First Listed Defendant   Bay County

(IN U.S. PLAINTIFF CASES ONLY)

NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

Attorneys (If Known)

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☒ 1  U.S. Government Plaintiff

☐ 3  Federal Question (U.S. Government Not a Party)

☐ 2  U.S. Government Defendant

☐ 4  Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES(Place an "X" in One Box for Plaintiff and One Box for Defendant)

(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury - | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☒ 690 Other | | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | Act | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge |
| ☐ 190 Other Contract | Product Liability | ☐ 385 Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Product Liability | ☐ 730 Labor/Mgmt.Reporting | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | | & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 791 Empl. Ret. Inc. | or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **Habeas Corpus:** | Security Act | ☐ 871 IRS—Third Party | ☐ 895 Freedom of Information |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | | 26 USC 7609 | Act |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | **IMMIGRATION** | | ☐ 900Appeal of Fee Determination |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | Under Equal Access |
| | Employment | ☐ 550 Civil Rights | ☐ 463 Habeas Corpus - | | to Justice |
| | ☐ 446 Amer. w/Disabilities - | ☐ 555 Prison Condition | Alien Detainee | | ☐ 950 Constitutionality of |
| | Other | | ☐ 465 Other Immigration | | State Statutes |
| | ☐ 440 Other Civil Rights | | Actions | | |

## V. ORIGIN (Place an "X" in One Box Only)

☒ 1  Original Proceeding
☐ 2  Removed from State Court
☐ 3  Remanded from Appellate Court
☐ 4  Reinstated or Reopened
☐ 5  Transferred from another district (specify)
☐ 6  Multidistrict Litigation
☐ 7  Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
18 U.S.C. 981(a)(1)(C) and 18 U.S.C. 981(a)(1)(A)

Brief description of cause:
civil forfeiture in rem

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

**DEMAND $**

CHECK YES only if demanded in complaint:

**JURY DEMAND:**   ☐ Yes   ☒ No

## VIII. RELATED CASE(S) IF ANY

(See instructions):

JUDGE

DOCKET NUMBER

DATE   12/31/19

SIGNATURE OF ATTORNEY OF RECORD

(on behalf of: AUSA Bonnie Glober)

FOR OFFICE USE ONLY

Frank M. Talbot, Chief, AUSA

RECEIPT #           AMOUNT           APPLYING IFP           JUDGE  32           MAG. JUDGE  JBT